HANEY et al. VS. NUGENT et al.

A conveyance of real estate from a father to his daughter, in payment for services rendered during six years previous in his store and family, under an alleged agreement that she should receive a salary of $500 a year, was *held* to be fraudulent as to existing creditors, on the ground of the grantor's embarrassments at the date of the conveyance, the daughter's opportunity of knowledge of the state of his affairs, the great disparity between the value of her services and the price it was alleged she was to receive for them, and the fact that the proof of the alleged contract rested entirely upon the testimony of the father and daughter, and that their statements and explanations were vague, unsatisfactory and often conflicting.

APPEAL from the Circuit Court for *Milwaukee* County.

This was an action by *Haney* and *DeBow*, judgment creditors of *James Nugent*, to set aside, as fraudulent and without consideration, a deed for lot 4 in block 134, in the city of Milwaukee, executed by said *James* to his daughter, *Mary Ann Nugent.* The judgment was rendered July 2, 1858, upon a note made by *James* and *Dennis Nugent*, dated February 16, 1857; and the deed from *James* to *Mary Ann Nugent* was executed on the 16th of October, 1857, and recorded on the 24th of November following. The answer of *James Nugent* alleges that in 1851 he started a small grocery store in Milwaukee, procuring the goods principally from Durand & Lawrence, and afterwards from Warren & Tracy; that he then promised his daughter, *Mary Ann*, that if she would take charge of it and carry on the business, he would, besides boarding her, allow her $500 a year; that she accordingly took charge of the store, and carried on the business herself, from that time until the commencement of this suit; and that out of the proceeds thereof, with the exception of some small sums received from his sons for board, the whole of his family had been supported: that he had never paid his daughter anything for her services until the 16th of October, 1857, when he executed to her a deed of said lot 4, in part payment therefor. The answer further stated, that on the 16th of February, 1857, *Dennis Nugent* (who was a son of said *James*,) bought the schooner "Brilliant," for $8,400; that said *James* signed with his son the notes given for that sum, and to secure $2,000 of the same, gave a mortgage on

lot 3, in block 134, in the city of Milwaukee, which mortgage was foreclosed, and the property sold, before the commencement of this action; that the judgment of the plaintiffs was for the amount of one of the notes so given; that at the time of the said conveyance to his daughter *Mary Ann*, his son *Dennis* still owned the schooner "Brilliant," and he himself owned the schooner "Albany," and said lots 3 and and 4, and 80 acres of land; that besides the said sum of $8,400 (of which $5,000 were paid before this suit was brought), he owed no debts of any consequence, except to said *Mary Ann;* that the schooner "Albany" was libelled for wages, &c., and sold, in December, 1857, for much less thaa her value; that the schooner "Brilliant," from which he expected that the indebtedness for which this suit was brought would be paid, was wrecked in November, 1857, with no insurance; and that he made the conveyance to his daughter without any intention to hinder or defraud his creditors, at a time when he supposed that he was abundantly able to pay his debts, and for the sole purpose of paying in part for her services, &c.

The answer of *Mary Ann Nugent* alleged the same facts.

On the trial, in November, 1859, *De Bow*, as a witness for the plaintiffs, testified that on the 5th of June, 1858, the note on which the plaintiffs afterwards recovered judgment against *James Nugent*, being then due, he called at the house of said *James*, (which was on lot 3, in block 134,) to ask where he was, and was informed by *Mary Ann Nugent* that he was in Kansas; that in reply to a question whether he owned lots 3 and 4 in that block, *Mary Ann* said that he did; that on being asked whether he would like to sell them, *Mary Ann* said she did not know—she would ask her mother; that the mother then said they would sell lot 3, but that lot 4 had been sold. He also testified that there was on lot 4 a shanty, one story high, and 12 or 14 feet square, used for a grocery. On cross-examination he said: "Mrs. Nugent said the property was rented to somebody." Proof was also introduced by the plaintiffs tending to show that the amount of goods purchased for the store of *James Nugent*, from Durand & Lawrence, and from Warren & Tracy, did not exceed, on the av-

June Term.
1860.

HANEY et al.
v.
NUGENT et al.

erage, from $500 to $600 a year, and that the services of a clerk in a retail grocery store were not worth over $250 or $300 a year, the clerk paying his own board. One witness thought that *Nugent* bought flour, butter, &c.., of other persons than Durand & Lawrence and Warren & Tracy, and that he probably made 25 per cent. profit on his sales.

John Thorson, a ship-chandler, in Milwaukee, testified as follows : " I think *James Nugent's* credit was not good in 1857 ; he gave us a note in 1856, due in June, 1858, which was not paid ; it was given on the vessel ' Albany ;' the indebtedness accrued in 1856 ; I made an attempt to collect the bill prior to his giving the note ; had a conversation with him, and took the captain's (*Dennis Nugent's*) note—a vessel note. I had a conversation with *James Nugent*, about the time navigation closed in 1857, and he said he could not pay the bill. *Dennis Dugent* had the supplies, as captain ; the note simply recited that there was so much due from the vessel, on account of supplies, and was signed by the master. I do not know in whose name the vessel was registered. In the fall of 1856, *James Nugent* owned another vessel, called the ' Major Barnum ;' she was lost previous to October, 1857; it was previous to his owning the ' Albany,' and there were bills due on the 'Major Barnum,' which have not been paid. I have asked him several times for payment."

The defendant *Mary Nugent* testified as follows : " A year ago a man came to my house and asked me who owned the house and lot where we lived ; I told him my father, but he said nothing as to the other lot ; I never said my father owned the lot he sold me in October, 1857, since that time ; I am 26 years old ; I have taken charge of the store since six months after the time my father opened it ; in 1851 my father agreed to give me $500 a year to take charge of the store ; since that time I have taken exclusive charge of it ; my mother has been of very little service, except during the time I was down town ; she has been sickly for 16 years ; has been unable to do anything for six years ; I kept the books ; sometimes in good times we took in $25 or $30 a day ; I would tell my father what goods we wanted, and he would go and purchase them ; we bought of farmers and

others; kept liquors and groceries; we sold in small quantities; when my father conveyed the property to me, I did not know of his being embarrassed; my father had a wood yard in Chicago in 1857, and spent a good portion of his time there; I did not know of any debts owing by him then; no claims had been presented at the store that were not paid; in 1857 he had the schooner Albany, the house where we lived, and a wood yard in Chicago; the Brilliant was lost; no claims were made that were not paid prior to October, 1857; the loss of the Brilliant, and indorsements for his son, were the cause of my father's failure; I have no knowledge of the cause of his embarrassment other than those I have stated; there was no understanding between me and my father that the conveyance to me was a cover, or in trust for him, directly or indirectly; I made provision for the family during this time, and the support of the family was principally derived from the store; I let my father have several small sums, to the amount of $300; I obtained this money from my brothers, for washing and sewing, and they sometimes gave me presents in money." On cross-examination she said: "I think the arrangement by which I was to have $500, was made in 1851, six months after the store started; I was then 18 years old; my father told me he had no time to attend to the store, and would give me $500 a year to attend it, and board me besides; I worked on until 1857, from October, 1851; never asked or received any payment during that time; I did not need it; my mother clothed me, and my brothers; I had a brother, captain of a vessel; I did not pay for my clothes out of the money I earned, but from that received from my mother and brothers. I took the deed for $2,000 due me for wages; I did not then know my father was embarrassed; I took charge of the house and store; my mother was sick; I did sewing and washing besides; we bought the goods principally from Durand & Lawrence; my father used to give me $10 or $15 at a time; he gave me a great deal of money, always as presents; he did not tell me it was part payment of the salary; he told me to take the lot for $2,000; I had no account on the books; I took things from the store when I wanted them, and made no entry of

them ; they were not charged to me. The deed was brought up to my mother to sign ; she signed it and my father gave it to me ; I have kept it ever since ; he took it down to the register's office, and was gone long enough to have it recorded, and brought it back in about half an hour ; I am sure and will swear he brought it back from the register's office on the same day it was signed ; it was signed on the day it is dated ; I gave my father no receipt for $2,000 on account of the deed, to apply on my salary, nor did he ask for any ; I did not ask him to give me the lot towards what he owed me ; he gave it of his own accord, without my asking for it ; my father, after he gave me the deed, got into difficulty in Chicago, and I let him have $300. No! that was not the way ; I let him have it at different times, but it was all given him before he gave me the deed ; it was not money taken in the store ; I paid all the bills in the store and kept the house ; when there was money over I gave it to my mother ; it did not take all the money taken in the store to keep the house and pay the bills ; we sold about $1,500 worth of goods a year ; I gave him money sometimes when he did not have any by him, or did not want to go to the bank after it. When he was flush he would let me have $15 or $20 at a time as presents ; I don't know what he did with the $300 ; I kept no account of the money I let him have, but kept it in my mind ; I remember it amounted to $300 ; I don't know when the schooner Albany was libelled ; I don't know that my father went to Chicago on business connected with the Albany. He went to Kansas a year ago last spring ; as far as I recollect I let him have $300 ; I let him have $57 at one time ; I can't remember what time ; I can't really tell ; it was not two years before the lot was sold to me ; I cannot say whether I let him have it to go to Kansas or Chicago. I never heard him say, nor did I see any one come there about anything to show that my father was embarrassed prior to making the deed. I think the sales amounted to about $1,500 a year ; I put on the books only what I sold on credit ; kept no account of cash sales ; I don't really know. Don't know whether the taxes have been paid on the lot since it was conveyed to me ; the taxes were paid

last year; my father pays them; he is my agent; my father hasn't paid any taxes for me but last year; he paid the taxes of 1857, when they were due I suppose; I don't know when they were due, nor when paid; I have got two receipts I believe. The store is closed; there is a house on my property; my brother-in-law rented it first after I got the deed; he is the only person to whom I ever rented it; I rented it to him over two years ago; the next spring after I got it. No! it was a year ago last April or May; he paid the rent promptly; he has paid all to me he has paid to anybody; I used the money for myself; I lease part of the property to Mr. Grant; he pays $20, payable in advance; he has paid three quarters in advance; I use it myself; no part of it goes to support my father's family; the store was closed last August; I have lived with my father since; I have my board; I pay nothing; I do the work; my father pays me nothing now. I said nothing to him about giving me the deed, or he to me; I took the deed for my pay—part payment of my salary; didn't say anything about the deed being good; it was talked over that the deed would be good; it was in my hands before my father carried it to the register's office."

Direct examination resumed: "I didn't see my father pay out the money I let him have; my father's presents in money would not exceed $30 or $40 in one year; as to the recording of the deed, it is a general impression I have; my impression is, it was brought back the same day."

Bagnall, a witness for the defendants, testified: "Until the 'Brilliant' was wrecked, in December, 1857, *James Nugent's* credit was perfectly good; I paid $3,500 for him on that vessel, and $2,500 was secured by mortgage. The price for which he purchased her was $9,000. The 'Albany' was sold in the fall of of 1857, in admiralty, for $600; was worth $1,500." Another witness testified that he had frequently been in *James Nugent's* store; had seen, he thought, from $1,000 to $1,500 worth of groceries in it at a time; did not know anything about the amount of sales; had been himself in the grocery business, and judged the profits to have been from 30 to to 50 per cent., but did not know the fact; had seen the daughter and Mrs. Nugent taking

charge of the store, and once saw *James Nugent* there. The defendants then proved that the note on which the plaintiffs recovered their judgment was given in part payment on the schooner "Brilliant," and that *Dennis Nugent* was the principal debtor and *James Nugent* the security. The defendant *James Nugent* testified as follows: "At the time I gave the deed to my daughter, I was worth about $8,000; I had not ten dollars of debts of my own owing at that time; I was liable for my son, for whom I had signed as surety to the amount of $8,500; the notes had been paid as they fell due, up to that time; $3,500 had fallen due; the vessel 'Brilliant' was lost in the beginning of December; when I came from Chicago she jogged me about the lot; she wanted I should give it to her towards her wages; I owned the 'Albany'; it was wrecked after I gave the deed to my daughter; I lost $400 worth of wood in addition; the note which I was sued on I signed as surety for my son; I never knew anything of the Thorson note until a year after it happened. *Dennis Nugent* owned the 'Albany' in January, 1857; I bought her in the spring, shortly after he purchased the schooner 'Brilliant;' he had nothing more to do with the 'Albany.' It is about eight years ago that I employed my daughter to keep the store; my daughter was going to get married; my wife was sickly, and I thought she was young enough, and I told her if she would stay at home I would give her $500 to take charge of the grocery. When I came back from Chicago, she jogged me about her pay, and wanted I should give her something; she spoke of it several times, and so I gave her the lot in part payment; I was prosperous then, and doing a good business; I had two vessels sailing the lakes. I gave a mortgage on the house and lot where I live, for $2,500, on the purchase of the 'Brilliant;' I did not consider it my debt; the lot was sold; I don't know what it brought; I don't recollect how many notes I signed with *Dennis Nugent;* all the notes that came due prior to October, 1857, were paid; I think he was to have three years to pay the whole amount; in October, 1857, there was $5,500 due; there was $6,000 unpaid, which consisted in part of notes I had signed with *Dennis Nugent,* and part was

secured by the mortgage on the property; I had other land; I sold it myself, over a year ago; no incumbrance on it; got over $400 on it; I had real estate in Kansas; got it since 1857; I went there a year ago last March; I had the money myself to go there; I got some from her to go to Kansas; not much; have forgotten how much; she gave me some; about $15 or $20; she did not give me all the money I had. Before the execution of the deed, I had borrowed from her $300; that was done prior to my going to Kansas; sundry times when I wanted to buy or pay for wood I got money from her; none of the money was from the sale of goods; her brother used to let her have money; I never let her have any clothes; she had to get her clothes from her own resources; she was 26 years old the 11th of last November."

The circuit court found as facts, among other things, that at the time of the conveyance to *Mary Ann Nugent*, the defendant *James Nugent* was not in embarrassed circumstances, and it was reasonable for him to suppose that the note on which the plaintiffs' judgment was obtained, would be paid by his son, *Dennis*, for whose benefit he had signed it, and that the inability of said *James* to pay his obligations arose from misfortunes which occurred subsequent to the giving of said conveyance. 2. That in view of the positive testimony of *James* and *Mary Ann Nugent* as to the agreement under which she managed the grocery store for $500 per annum, the agreement was not in itself so greatly improbable as to convict them both of perjury; and that such agreement must therefore be considered established by the testimony. Judgment that the complaint be dismissed.

*Butler, Buttrick & Cottrill*, for appellants.

*Brown & Ogden*, for respondents.

*By the Court*, DIXON, C. J. The questions presented in this case are purely of fact, and as lengthy discussions of such matters are of little general interest, we shall be very brief. After a careful consideration of the testimony, we are forced to the conclusion, that the conveyance from the defendants *James* and *Mary Nugent*, to the defendant *Mary Ann Nugent*, was voluntary, and fraudulent as to the credi-

tors of *James*. This conclusion is founded upon the proof of his liabilities and embarrassments at the time it was executed; the improbable nature of the contract for services under which *Mary Ann* claims to have paid for the lot, particularly the great disparity between the actual value of her services and the price which it is said she was to receive; the relationship which existed between them; her situation as a member of his family, and the knowledge which she must have had of his affairs and business; the fact that the defense rests entirely upon her evidence and that of the defendant *James*, the real parties in interest; her admissions that she received " a great deal of money" from him during the alleged employment, and that she was in the habit of taking and retaining money from the store, the amount of which is not stated, and all of which is unaccounted for, save as she says the sums thus received were presented to her; and above all, the vague, unsatisfactory, and often conflicting nature of their statements and explanations. These, among other similar things disclosed by the record, render the real character of the transaction so apparent, that we do not think it would be likely to be changed by the *appearance* of the witnesses upon the stand.

We must therefore reverse the judgment of the circuit court, and remand the cause, with directions that judgment be entered for the appellants, in accordance with the prayer of the complaint.